**FIRST NATIONAL BANK IN DALLAS, and Jo Anna R. Kaspar, Appellants,**

**v.**

**WHIRLPOOL CORPORATION, Appellee.**

**No. 5295.**

Court of Civil Appeals of Texas, Waco.

Nov. 15, 1973.

Coke & Coke, Paul H. Stanford, Dallas, for appellants.

Ungerman, Hill, Ungerman, Angrist, Dolginoff & Teofan (Robert C. McGuire), Dallas, for appellee.

## OPINION

JAMES, Justice.

This case involves questions of the validity of a statutory and constitutional materialman's lien, and its superiority over a prior recorded deed of trust lien on the real estate.

Plaintiff-Appellee Whirlpool Corporation brought this suit to establish and foreclose a statutory and constitutional materialman's lien on disposals, dishwashers, cooking ranges, and refrigerators which were delivered and installed in the Greenock Acres Apartments, which apartments were owned by Beckwood, Inc. and which were in the process of being constructed in Dallas, Texas.

Defendant-Appellant The First National Bank in Dallas had a deed of trust on the realty which it foreclosed after Beckwood, Inc. made default, after which the realty was sold to Defendant-Appellant Jo Anna R. Kaspar. The trial court held that Whirlpool had perfected a superior statutory and constitutional materialman's lien on its disposals, dishwashers, ranges, and refrigerators at the property and entered a judgment foreclosing such lien. We affirm the trial court's judgment, insofar as the statutory materialman's lien is concerned.

Whirlpool in its Original and First Supplemental Petition sued First National and Mrs. Kaspar and in effect alleged that it (Whirlpool) had furnished materials to "Beck Companies" as follows: 77 Whirlpool refrigerators, 85 Whirlpool electric ranges, 138 Whirlpool dishwashers, 149 Whirlpool dishwasher panels and 119 Whirlpool disposals, all of the aggregate value (based upon agreed unit prices) of $39,079.97, of which $29,144.95 had been paid, leaving an unpaid balance of $9,935.-02. Whirlpool further alleged: "That said materials were furnished for said Beck Companies . . . to be used in the construction or repair of buildings and improvements situated on land owned . . . by Beckwood, Inc. pursuant to the terms of a sham original contract by and between said Beck Companies and the said reputed owner, Beckwood, Inc. . . .". After giving the legal description of the subject real estate, Plaintiff Whirlpool goes on to allege: "That Whirlpool Corporation claims a lien upon said buildings and improvements and upon said land and that said Beck Companies were subject to the effective control of Beckwood, Inc. and pursuant to the provisions of Article 5452, et seq., Vernon's Ann.T.S., Whirlpool Corporation was, as a matter of law, deemed to be in a direct contractual relationship with Beckwood, Inc., the reputed owner of the above-described property and improvements, and entitled to perfect its lien against the afore-mentioned property and improvements as an original contractor".

Plaintiff Whirlpool further alleged that the subject materials were furnished pursuant to "contracts" between Whirlpool and Beck Companies, copies of which were attached to the original petition; that First National (after default by Beckwood, Inc.) foreclosed its deed of trust and bought in the real estate on or about December 1, 1970, and thereafter, in January 1971 sold the real property to Jo Anna R. Kaspar; that Whirlpool had filed its statutory materialman's lien on September 3, 1970. It was further alleged that Beck Companies and Beckwood, Inc., were notoriously insolvent and pending in bankruptcy; that Whirlpool's lien is prior and superior to any claims asserted by First National and Mrs. Kaspar, and prayer was for foreclosure of the materialman's lien on the subject appliances, to satisfy the $9,935.02, interests and costs.

Plaintiff's First Supplemental Petition had the following further allegations concerning Beckwood, Inc., the owner of the real estate, and Beck Companies, to whom Whirlpool sold the subject appliances:

"Plaintiff would additionally or alternatively show that Beck Companies and

Beckwood, Inc. were the alter egos of Arthur W. Beck, Jr. and the affairs of Beck Companies and Beckwood, Inc. and Arthur W. Beck, Jr. were indistinguishable from one another and under the control of each other; same were intermixed to such a degree and extent that they were joint *ventures* and owners and partners in the project in question. In the further alternative, Beckwood, Inc. was merely one of the Beck Companies which in effect was Arthur W. Beck, Jr. The Bankruptcy Court in BK 3–1995 in the bankruptcy of Arthur W. Beck, Jr. and wife in the United States District Court for the Northern District of Texas, Dallas Division, found that Beck Companies and Arthur W. Beck, Jr. and Beckwood, Inc. were all alter egos of each other and since the First National Bank in Dallas was a party to such proceeding, such determination by such Court is binding upon the First National Bank in Dallas and upon its alleged purchaser, Jo Anna R. Kaspar."

It was further alleged that the subject appliances may be removed from the realty "without material injury to (1) the realty, (2) the remainder of the improvements and (3) the articles themselves."

To these Plaintiff's pleadings by Whirlpool, Defendants First National and Mrs. Kaspar pleaded only a general denial, levelled no special exceptions thereto, and did not assert any affirmative defenses.

Trial was had to the court without a jury, which entered judgment in favor of Plaintiff Whirlpool to the effect that Whirlpool had a valid constitutional and statutory materialman's lien on certain particularly described appliances (by individual serial numbers) to wit, 138 dishwashers and panels, 90 disposals, 86 ranges and 77 refrigerators; that said materialman's lien was superior to any claims or interest of Defendants First National and Mrs. Kaspar; ordering a foreclosure and sale of the subject appliances to satisfy the sum of $9,935.02, interest from date of judgment

and costs; and authorizing the Sheriff to remove the subject appliances from the real estate.

Defendants requested and the trial court made findings of fact and conclusions of law, pertinent parts of which will be discussed herein.

Defendant-Appellants First National and Mrs. Kaspar appeal on forty-four points of error. We will discuss such of these points as we deem necessary to a disposition of this case, in groups for convenience.

Points one through five and nine through eleven assert the trial court erred in holding that Whirlpool had a valid statutory materialman's lien on the subject appliances which was superior to the interests of First National and Mrs. Kaspar. We overrule this contention.

Beckwood, Inc., had executed a deed of trust conveying the subject real estate in favor of First National to secure the payment of a note in the amount of $1,850,000.00, which note had been executed by Beckwood, Inc., and Arthur W. Beck, Jr., individually, payable to First National. This deed of trust was filed for record July 31, 1969, in the County Clerk's office of Dallas County, Texas. In addition thereto, Arthur W. Beck, Jr., individually on March 19, 1970 executed a security agreement in favor of First National.

After the deed of trust had been executed, in the latter half of the year 1969, Beckwood, Inc., the owner of the real estate, commenced and carried on construction of an apartment complex known as "Greenock Acres Apartments" located on the subject real estate. First National advanced funds for such construction to Beckwood, Inc.

Beck Companies on or about December 24, 1969, submitted to Whirlpool a purchase order for appliances to go into Greenock Acres Apartments of the following tenor:

FORM. 3.181

## PURCHASE ORDER

# BECK COMPANIES

**PURCHASE ORDER NO.** 8428

DATE: December 24, 1969

TERMS: 60 Days Net

TO: Whirlpool Corporation
8000 Ambassador Row
Dallas, Texas

SHIP TO: Greenock Acres
8900 Park Lane
Dallas, Texas

MAIL INVOICE TO: Same

## PLEASE FURNISH US WITH THE MATERIAL SPECIFIED BELOW ON TERMS AND CONDITIONS AS SHOWN:

| ITEM | QUANTITY | | DESCRIPTION OF MATERIAL | UNIT PRICE | NET PRICE |
|---|---|---|---|---|---|
| | 187 | SMD40 | Disposer | 22.25 | 4,160.75 |
| | 187 | SVU60 | Dishwasher | 86.25 | 16,128.75 |
| | 187 | SCF10 | Dishwasher panels –white | 6.50 | 1,215.50 |
| | 187 | RTE300 | Electric range white | 102.75 | 19,214.25 |
| | | | electric cord for range | 1.65 | 308.55 |
| | 188 | ETT12D | 12' refrigerators, all white | 128.25 | 24,111.0C |
| | | | (94 right hand door) | | |
| | | | (94 left hand door) | 4.50 | 841.5( |
| | | | Uncrating (187) | | |

It is understood per attached letter that no service warranty is
included, but it is our option to add $16.50 per apartment
unit for service.

Advertising Allowance of 5.00 per unit,
or total of $935.00.

SALES TAX: 2,768.4

68,748.7

MAIL _____ COPIES OF YOUR
INVOICES ON DATE OF SHIPMENT.

_____ packing lists
must accompany shipments. Show order
number and contents.

This order is not binding until accepted; acceptance of this
order in writing shall constitute acceptance of all the terms
and conditions shown.
PLEASE SIGN AND RETURN ACCEPTANCE COPY
AT ONCE

Accepted: _Dallas Sales Firm Whirlpool Corp_
FIRM NAME

By: _____

Approved: _____ Date: _____

By: _____

## BECK COMPANIES

By: _____

SUPPLIER

PLAINTIFF'S
EXHIBIT
91

6.

Whirlpool responded to this purchase order on or about January 30, 1970, by the following letter to the Beck Companies:

# Whirlpool CORPORATION

### DALLAS SALES DIVISION
8000 AMBASSADOR ROW, DALLAS, TEXAS 75247

January 30, 1970

TELEPHONE:
APPLIANCE SALES: a.c. 214 631-2640
FSP Parts: a.c. 214 637-3840

Mr. Paul D. McElroy
Director of General Contracts
The Beck Companies
Frito Lay Building - Suite 721
Dallas, Texas

Dear Mr. McElroy:

We are extremely pleased to hear that you plan to use Whirlpool kitchen equipment in some of your forthcoming projects. The Dallas Sales Division, subject to product availability from our factories, agrees to furnish the following equipment, at indicated prices, until and no later than July 31, 1970.

The prices listed below do not include warranty service charges and certain conditions, regarding service, must be met in order to waive these charges.

| SMD 40 | Disposer | $ 23.36 |
|---|---|---|
| SVU 60 | Dishwasher | 90.56 |
| SCF 10 | Dishwasher Panel | 6.60 |
| RVE 300 | Electric Range | 102.75 |
| RVE 305 | Electric Range | 112.75 |
| RTE 315 | Electric Range | 135.75 |
| ETT 12D | Refrigerator | 134.66 |
| Electric Cord for Ranges | | 1.65 |

PLAINTIFF'S EXHIBIT 92

Again, let me emphasize that the above prices are without our warranty service and if this is desired, the prevailing service costs per unit must be added at the time of purchase.

Additionally, the above prices do not include uncrating, setting in place, or disposing of cartons. Units must be purchased in truckload quantities.

If we can be of further service to you. please advise.

Very truly yours,

Harry L. Yaws
Branch Manager

HLY:lm

Pursuant to the above purchase order made by the Beck Companies accepted by Whirlpool, and the reply letter made by Whirlpool, Plaintiff-Appellee Whirlpool delivered the subject appliances to Greenock Acres Apartments for installation in the apartments over a period of time in successive deliveries, the last delivery having been made on May 8, 1970. There were offered in evidence sixteen invoices to support the deliveries, each of which showed the number of units, the unit price of the type units described, and the total money value of the units covered by each such invoice. These invoices were supported by such documents as delivery receipts, bills of lading, and in some instances other documents not necessary to enumerate.

As stated before, the total money value of all the appliances furnished by Whirlpool to the apartment complex was $39,079.97. Payments were made to Whirlpool totaling $29,144.95 on this amount leaving an unpaid balance of $9,935.02.

On September 3, 1970, Whirlpool filed for record its materialman's lien in amount of $9,935.02 for the subject appliances, and also claiming a lien against the real estate owned by Beckwood, Inc., asserting a sham original contract between Beck Companies and Beckwood, Inc., for the construction of Greenock Acres Apartments, and further claiming that under Article 5452 et seq., Whirlpool "is as a matter of law, deemed to be in a direct contractual relationship with Beckwood, Inc.," the owner of the realty and improvements. Also, on September 4, 1970, Whirlpool through their attorney mailed by certified mail two copies of their "Affidavit Claiming Lien", which was shown to be delivered to Beckwood, Inc., on September 8, 1970.

■ The refrigerators furnished by Whirlpool are connected with the realty only by being plugged into a 110 volt electrical outlet. The ranges (cookstoves) are connected with the realty only by being plugged into a 220 volt electrical outlet. The disposals are connected to the realty as follows: The unit is screwed into a connection under the kitchen sink, connected at the bottom to the drain pipe, and plugged into an electrical outlet. Each of the dishwashers (with its accompanying dishwasher panel) is "slid" into a place provided under the kitchen cabinet, connected with three or so screws to the underneath side of the kitchen cabinet, plugged into an electrical outlet, and connected to a water pipe and drain pipe. These appliances were delivered to the Greenock Acres Apartments project for the purpose of improving the property and were intended to remain at such property until they wore out. Proof showed that it was customary in such apartment complexes to move appliances from apartment to apartment, particularly when appliances needed repairing or replacing. The trial court found, and we agree, that the subject appliances may be moved from the project without injury to the project, the realty, the remaining improvements, or the appliances themselves.

In order to determine the validity of the statutory materialman's lien in question, a review of the pertinent statutes is necessary. As applicable to the facts of our case, Article 5452, V.A.T.S., Section 1 in effect provides that any person or firm who may furnish material "for the construction or repair of any house, building or improvement whatever—upon complying with the provisions of this Chapter shall have a lien on such house, building, fixtures, improvements . . . and . . . the lot or lots of land necessarily connected therewith . . . to secure payment: (a) for . . . the material furnished . . . for such construction and repair . . . ."

Art. 5452, Section 2b(1) provides:

"b. The words "material", "furnish material" or "material furnished" as used in

this Act are to be construed to mean any part or all of the following:

"(1) *Material, machinery, fixtures* or tools *incorporated in the work, or consumed in the direct prosecution of the work,* or ordered and delivered for such incorporation or such consumption." (emphasis supplied).

Art. 5452, Sec. 2e provides:

"e. An original contractor is defined as one contracting with an owner, directly *or through his agent*; and an original contract is defined as an agreement to which an owner is a party, either directly *or by implication of law.* There may be one or more original contractors." (emphasis supplied).

Article 5452–1, Section 1 provides:

*"Sham Contracts, Perfecting Liens*

"1. Whenever any owner of real property shall enter into any contract with a corporation for the construction or repair of any house, building or improvements thereon, and said owner can effectively control the corporation with whom such contract is made, through the ownership of voting stock therein, interlocking directorships or otherwise; or, when any owner of real property shall enter into such a contract with any natural person or corporation for such construction or repair, and it shall be proved by a preponderance of the evidence that such contract was made without good faith intention on the part of the parties thereto that it was to be performed by said person or corporation, then in either such event, any person, firm or corporation who, under a direct contractual relationship with said person or corporation and who may . . . furnish . . . material to be used in the prosecution of the work under such contract shall be deemed to be in a direct contractual relationship with the owner and may perfect his lien against the property in the same manner as any other original contractor."

Article 5453, Sec. 1 provides:

"1. Every original contractor, not later than one hundred twenty (120) days, . . . after the indebtedness accrues as defined hereinafter in Article 5467, shall file his affidavit claiming a lien, . . . in the office of the . . . county clerk . . . and he shall send to the owner by certified or registered mail two (2) copies of such affidavit claiming a lien."

Art. 5459, Sec. 1 as amended in 1971 (which has the same wording as Art. 5459 in toto prior to the 1971 amendment) provides:

*"Priority of lien.*

"Section 1. The lien herein provided for shall attach to the house, building, improvements or railroad for which they were furnished or the work was done, in preference to any prior lien or encumbrance or mortgage upon the land upon which the houses, buildings or improvements, or railroad have been put, or labor performed, and the person enforcing the same may have such house, building or improvement, or any piece of the railroad property, sold separately; provided, any lien, encumbrance or mortgage on the land or improvement at the time of the inception of the lien herein provided for shall not be affected thereby, and the holders of such liens need not be made parties in suits to foreclose liens herein provided for."

Article 5467, entitled "Accrual of indebtedness", Sec. 1a provides:

"1. For the purpose of this Act, indebtedness, except for retainages, shall be deemed to have accrued as follows:

"a. For an original contractor immediately upon any material breach or termination of the original contract by the owner, or on the tenth (10th) day of the month next following the month in which the original contract has been completed, finally settled, or abandoned."

Article 5471, entitled "Separate sales" provides:

"When the house, building, improvement, or any piece of the railroad's property is sold separately, the officer making the sale shall place the purchaser in possession thereof; and such purchaser shall have the right to remove the same within a reasonable time from the date of purchase."

■ At the outset, we should recognize that it is a rule of long standing that the mechanic's and materialmen's lien statutes of this State will be liberally construed for the purpose of protecting laborers and materialmen. University Savings and Loan Ass'n v. Security Lumber Co. (Tex.Sup. Ct.1967) 423 S.W.2d 287; Hayek v. Western Steel Co. (Tex.Sup.Ct.1972) 478 S.W. 2d 786.

■ The trial court found (in its conclusions of law) that the deliveries to Greenock Acres Apartments of all the subject appliances were part of one transaction under Plaintiff's Exhibits Nos. 91 and 92, same being the purchase order dated December 24, 1969 made by Beck Companies and accepted by Whirlpool, and Whirlpool's letter of January 30, 1970, both copied in full hereinabove in this opinion. We agree. Since the last delivery was made by Whirlpool on May 8, 1970, then under Article 5467, the indebtedness accrued on June 10, 1970; therefore Whirlpool in the status of an original contractor had 120 days from June 10, 1970, in which to file its lien affidavit under Article 5453. Therefore, by filing its lien affidavit with the county clerk on September 3, 1970, Whirlpool was well within the 120 day period.

■ The trial court further concluded that Whirlpool had the status of "original contractor" on its deliveries of the materials (appliances) furnished to Greenock Acres Apartments. We agree, because there is ample evidence in the record to show that Arthur W. Beck, Jr., d/b/a

Beck Companies and Beckwood, Inc., were the alter egos of each other.

In another conclusion of law, the trial court found that Beckwood, Inc., was one of the Beck Companies and the affairs of Arthur W. Beck, Jr., Beck Companies and Beckwood, Inc., were indistinguishable from one another and all were under the control of Arthur W. Beck.; such parties were intermixed to such a degree and extent that they were joint owners, partners and joint venturers and agents of each other on the Greenock Acres Apartments project and alter egos of each other on such project. We agree, and will discuss the evidence supporting this finding in more detail later in this opinion. At this point, suffice it to say that Whirlpool was entitled to the status of an original contractor under Articles 5452, Section 2e and 5452–1, Section 1.

■ A materialman's lien is superior as to the improvements made (here, the appliances in question) to a deed of trust lien where the improvements have not become so permanently attached to the land and existing improvements that they may be removed therefrom without material injury to the land and existing improvements or to the improvements removed, even though the deed of trust was recorded prior to the furnishing of materials and labor by the materialman. Articles 5452, 5459, and 5471; Summerville v. King (Tex.Sup.Ct. 1904) 98 Tex. 332, 83 S.W. 680; Freed v. Bozman (Texarkana, Tex.Civ.App.1957) 304 S.W.2d 235 error refused NRE; Parkdale State Bank v. McCord (Corpus Christi, Tex.Civ.App.1968) 428 S.W.2d 121, error refused NRE.

*Parkdale* quotes language from an article in 40 Texas Law Review 872, 876, entitled, "Priority of Mechanics' and Materialman's Liens in Texas" as follows:

"In discussing the effect of Article 5459 on the situation where there is an earlier lien on the land and a subsequent mechanics' lien on the building or improvements, the cases fall into two categories.

"(1) Where the building or improvement is severable, a mechanics' lien may exist on such building or improvement independently of any prior lien on the land; and the mechanics' lien holder may have such building or improvement sold separately, provided this can be done without materially affecting the rights of other interested parties. Where the improvements can be sold separately, they are not treated as part of the realty, but are treated as if made under a contract for removal. This rule has been applied to improvements such as pumps fastened to beds of concrete but removable without injury to the land; a cotton house located near to, but not connected with a cotton gin; a ticket booth, speaker stands, and screen at a drive-in theater; and even to a rock house which the mechanics' lien claimant had constructed.

"(2) Where the nature of the improvement is such that it is merged in and becomes a part of the building or structure improved, e. g., painting and plastering, roof repairs, or window frames, the subsequently accruing mechanics' liens will not be given priority over the existing lien on the property and building. If the nature of the repairs or improvements is such that they can be removed without damage to the building, the mechanics' liens may be asserted if the material can be so identified as to segregate it from materials supplied by others, as for example, plumbing fixtures, chandeliers, and air conditioning window units. The theory that applies to repairs to encumbered existing buildings also applies to the erection of new buildings or improvements where the severance and removal of such buildings or improvements would materially injure the realty." We have omitted the citation of authorities contained in the footnotes of the original article.

Points six through eight complain there is no evidence, and insufficient evidence, to support the finding that Whirlpool furnished the appliances pursuant to dealings with the "owner" of the realty; points twelve through sixteen complain of the holding that Beck Companies was the "agent" of Beckwood, Inc., because of no pleadings, no evidence, and that same is against the great weight and preponderance of the evidence. Points seventeen through nineteen complain of the finding that Beck Companies was the "joint venturer" of Beckwood, Inc., because of no evidence, and insufficient evidence. Points twenty through twenty-three complain of the holding that Beckwood, Inc., and Beck Companies were "indistinguishable" and "alter egos of each other", because of no evidence and insufficient evidence, and also complain of the trial court's admitting into evidence the "Order of Alter Ego" of the Referee in Bankruptcy.

We overrule all these contentions. We have reviewed herein the pertinent portions of Plaintiff's pleadings with reference to the "alter ego," "agency," "joint venturers," and "sham contract" problem, and find them to be sufficient. At any rate, the Defendants levelled no special exceptions to these pleadings and made no objection to Plaintiff's evidence thereon for lack of pleadings, and have therefore waived any objections which they may have heretofore had to the sufficiency of these pleadings. Rule 90, Texas Rules of Civil Procedure. The evidence is ample and practically undisputed to support these findings, the more salient features of same being as follows:

Arthur W. Beck, Jr., testified that the Beck Companies was unincorporated and was "actually the management company of our various activities"; that it was "Arthur W. Beck, Jr., d/b/a Beck Companies"; that he (Arthur W. Beck, Jr.) was the sole stockholder of Beckwood, Inc.; that he had "forty or fifty" different companies, some incorporated, and some not, each performing "different functions" of his operations; that he owned the majority of the voting stock in all these companies

that were corporations; that he was president of Beckwood, Inc.; that in connection with the Greenock Acres Apartment project, he furnished the First National Bank in Dallas a personal financial statement, a "consolidated statement" or "summary", rather than "thirty or forty individual ones." He further testified that in each of his companies that were corporations, that "Typically, I would be president" or else it would be somebody that he requested to be president.

W. J. Ellis, a Vice President and real estate loan officer of First National for the past eight years, the man in charge of the Greenock Acres loan, testified that as background for this loan the Bank got a financial statement and credit reports on Arthur W. Beck, Jr.; that they "understood" that Beckwood, Inc., was owned by Arthur W. Beck, Jr. This consolidated financial statement was offered into evidence (Plaintiff's Exhibit No. 97), shown to be prepared by the Vice President and Controller of Beck Companies, and showed all of Beck's assets and liabilities in all his operations and various companies, and specifically included Greenock Acres Apartments. It showed Beck Companies had put up $18,500.00 worth of refundable loan commitment fees concerning Greenock Acres Apartments, in and among a total of $62,900.00 which embraced other projects.

Whirlpool offered in evidence a certified "Order of Alter Ego" made by the Referee in Bankruptcy which among other things, declared that Arthur W. Beck, Jr., Beck Companies, and Greenock Acres were alter egos of each other. The order listed forty-eight (48) different companies in which Arthur W. Beck, Jr., did business, and declared all of them subject to the bankruptcy proceeding in which Arthur W. Beck, Jr., was the principal bankrupt.

In this bankruptcy case, First National had filed a creditors claim, and prior to the entry of the "Order of Alter Ego" by the Bankruptcy Court, First National had received a notice that the hearing was to be had, but did not appear at the hearing. This "Order of Alter Ego" is merely cumulative of the other overwhelming evidence to the effect that Arthur W. Beck, Jr., Beck Companies, and Beckwood, Inc., were agents, joint venturers, and alter egos of each other.

For the above reasons, we hold that Whirlpool, in furnishing the materials in question to Beck Companies, was contracting with Beckwood, Inc., the owner of the realty, by implication of law, within the meaning of Article 5452, Sec. 2e; and the dealings between Beck Companies and Beckwood, Inc., were a "sham contract" within the meaning of Article 5452–1, Section 1.

This being true, Whirlpool enjoyed the status of an original contractor in filing and perfecting its statutory materialman's lien, and we hold that said statutory materialman's lien was properly filed and perfected.

We have already discussed and disposed of Appellants' points twenty-four through twenty-nine, by holding that all of Whirlpool's sales to Beck Companies were part of one transaction, that growing out of the purchase order and letter of reply (Plaintiff's Exhibits 91 and 92) hereinabove quoted and discussed.

Appellants' point thirty complains of the trial court's holding that Whirlpool was an "original contractor" for purposes of the materialman's lien statute. We have already stated our reasons for overruling this point.

Appellants' points thirty-one through thirty-eight complain of no evidence, and insufficient evidence, to support the findings that the appliances were delivered to the realty.

We overrule these points, as the evidence is ample to support this finding. The sixteen invoices hereinabove referred to, accompanied by supporting documents,

being Plaintiff's Exhibits 1 thru 87, were offered in evidence through the witness James Lewis, credit manager for Whirlpool. Lewis testified without objection that all these appliances covered by these invoices were delivered to the Greenock Acres project. There is no testimony in the record to refute this.

Moreover, First National and Mrs. Kaspar through their attorneys filed a written stipulation to which was attached an inventory of the appliances which were located at the Greenock Acres Apartments in January 1971, at the time Mrs. Kaspar purchased the project from First National. Appellants objected to the admission of this stipulation which was admitted in evidence; but appellants never denied its accuracy.

Additionally, Richard McClaskey, an employee of Whirlpool, made an inspection of part of the apartment project in March 1972 for the purpose of checking out the appliances there by serial numbers. He prepared an inventory list of the appliances, which he inspected, circling in red the appliances in the vacant apartments, and circling in black the appliances which were included in the stipulation of Appellants above referred to.

Points thirty-nine through forty-two attack the validity of the Constitutional Materialman's lien under Article 16, Section 37 of the Texas Constitution, which lien the trial court held in favor of Whirlpool as superior to Appellants' interests, insofar as the appliances were concerned. In view of our holding that Whirlpool has a valid statutory materialman's lien on the appliances which is superior to Appellants' interests, it is unnecessary for us to pass upon these points, and we therefore decline to do so.

We have carefully considered Appellants' remaining points and contentions, and overrule same.

Judgment of the trial court is affirmed.

Affirmed.